**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **INSURANCE DISTRIBUTORS** | § | |
| **INTERNATIONAL (BERMUDA) LTD.** | § | |
| | § | |
| **V.** | § | **A-08-CA-767 AWA** |
| | § | |
| **EDGEWATER CONSULTING GROUP** | § | |
| **LTD.** | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the above-entitled cause of action. The parties appeared for a bench trial

and the Court heard testimony and evidence between February 18, 2010, and February 23, 2010.

Pursuant to the Court's Order of February 25, 2010, (Clerk's Doc. No. 131), the parties filed post-

trial briefing. The last of all of that briefing was received in June 2010. Having considered the

evidence and testimony, pre-trial motions, and post-trial briefing, the Court enters the following

Memorandum Opinion and Order.

**I.      Findings of Fact**

This declaratory judgment and breach of contract action arises out of a multi-year relationship

between a lawyer and an insurance brokerage. The history of that relationship, and of the written

contract that eventually was negotiated and agreed upon to define the relationship, is essential to an

understanding of the issues presented by the case.

Leslie Giordani was an attorney with the Austin law firm Osborne, Lowe, Helman & Smith

in the 1990's, and practiced primarily trust and estate law representing high net worth clients. As

part of that practice she regularly worked in conjunction with life insurance brokers. She was thus

acquainted with Bill Waxman and Dennis Cavner, who were co-owners of a domestic life insurance

brokerage (and who also both happened to possess law degrees). Tr. Vol. IA at p. 32.[1] She also worked with John Lawson, who at the time worked for another insurance firm, Michael Kentor. *Id.* At Lawson's request, Giordani introduced Lawson to Waxman and Cavner when Lawson was looking to leave Michael Kentor. Tr. Vol. IA at p. 35. Giordani testified that she called Bill Waxman and recommended that he hire Lawson, which Waxman did. Tr. Vol. IB at p. 86. The firm eventually became known as Waxman, Cavner & Lawson ("WCL").

In the late 1990's Giordani began to investigate the market for offshore private placement life insurance. Tr. Vol. IA at p. 39. Offshore private placement life insurance ("OPPLI") is an insurance product that transforms ordinary taxable income and capital gains into tax-free income with no IRS reporting requirement. Tr. Vol. II at p. 97. The purchaser funds a policy, the premium is then invested and managed by either an investment manager or the insurance company, but the policy is not deemed a security. Because a private placement policy is not registered under the SEC, the types of investments available for the cash value of the policy can include non-SEC-registered investment pools like hedge funds. Tr. Vol. IA at p. 36. Assets grow and compound income tax free and the settlor can withdraw the basis or the amount of premium invested, and borrow from the policy without income tax liability. Tr. Vol. IA at p. 8, 36, 38, 45. These policies are typically of high worth.[2] As its name suggests, OPPLI is brokered, written and managed offshore. It has not been approved for sale in the United States and cannot be sold in the United States. Tr. Vol. IA at p. 37.

---

[1] The Transcript in this case contains two Volumes I, a Volume II, and a Volume III. To clarify, the Court will refer to the Volumes I as "Tr. Vol. IA" and "Tr. Vol. IB."

[2] Lawson testified that WCL typically requires a five million dollar premium deposit for this type of policy, although the average policy is more like fifteen million. Tr. Vol. IA at p. 38.

OPPLI is cheaper than domestic PPLI policies because there is no state premium tax payable on OPPLI policies.  Tr. Vol.  II at p. 97.

As noted, the  principals of WCL were acquainted with Giordani and her trust law practice. Because of her offshore trust practice, Giordani had educated herself about offshore life insurance companies. Tr. Vol. IB at p. 86.  While the testimony regarding who initially had the idea to coordinate their actions related to OPPLI was disputed,[3] around 1998 or 1999, Lawson and Giordani approached the other lawyers at Osborne Lowe about OPPLI and suggested that such a structure could be used to the benefit of Osborne Lowe's estate-planning clients.  Tr. Vol. IA at p. 40, 44; Tr. Vol. IB at p. 87.  Eventually, in 1999, the principals of WCL and lawyers of Osborne Lowe agreed to a coordinated pursuit of structuring offshore private placement life insurance transactions for the clients of Osborne Lowe.  Importantly, as a domestic insurance brokerage with all its principals holding state licenses, WCL could not solicit the placement of such insurance nor could its principals engage in such activities in Texas.[4]  *See* Plaintiff's Response at p. 1; Tr. Vol. IA at p. 37, 41. Giordani testified that she came up with the idea of creating an offshore Bermuda brokerage that WCL would own.  Tr. Vol. IB at p. 90.  Thus, the principals of WCL formed an offshore insurance brokerage in Bermuda, Insurance Distributors International (Bermuda) Ltd. ("IDI")—the Plaintiff

---

[3]Giordani testified that she first broached the issue of OPPLI with Lawson. Tr. Vol. IB at p. 88.

[4]Lawson testified at trial that "Waxman, Cavner & Lawson is a U.S. company, licensed to do business with insurance companies in the U.S., and all – Bill Waxman, Dennis Cavner and myself are licensed in the U.S., and you have to have a state license and the product has to be admitted in the state where you are selling it.  So by definition we cannot under U.S. or state law sell a non-admitted insurance product."  Tr. Vol. IA at p. 41.  Lawson testified WCL is precluded from speaking to potential offshore PPLI clients at or from their Austin offices because such contacts would qualify as solicitations.  Tr. Vol. IA at p. 44.

in this case—which would specialize in brokering offshore private placement life insurance.   Tr. Vol. IA at p. 42.   In creating IDI, WCL conferred with an attorney in Bermuda named Gordon Hill, as well as Jim Shawn, whom Lawson testified is an expert in insurance law.   Tr. Vol. IA at p. 42. Throughout this time Osborne Lowe also acted as IDI's attorneys.   WCL and IDI had the same three partners and same partnership ownership. Tr. Vol. IA at p. 52.

The portion of the transaction most relevant to this dispute is that Osborne Lowe and IDI also entered into an unwritten arrangement that Osborne Lowe would refer its high net worth clients to IDI for private placement life insurance and IDI would pay Osborne Lowe 50% percent of the net profit[5] generated by IDI as legal fees.   Tr. Vol. IA at p. 45-47; Tr. Vol. IB at p. 90.   Osborne Lowe represented WCL at the time and Leslie Giordani was WCL's principal attorney and the main source of Osborne Lowe referrals to IDI.   Tr. Vol. IA at p. 48.   Giordani testified that although IDI could not solicit clients in the United States, as an attorney, she could recommend OPPLI to a client and refer them to IDI, which would not run afoul of the anti-solicitation provisions of the Insurance Code, since IDI was a Bermuda-based company.   Tr. Vol. IB at p. 92.

In 2000, upon the breakup of Osborne Lowe, IDI bought out Osborne Lowe's profits interest for the lump sum $150,000.   Giordani, however, retained her interest and brought that with her to her new firm, Giordani, Schurig, Beckett & Tackett ("GSBT").   *See* Plaintiff's Exhibit 32; Tr. Vol.

---

[5]Lawson testified that when an insurance broker sells a policy, the broker receives a modest fee upfront from the buyer of the policy , and then receives an ongoing commission payment from the insurance carrier, termed a "trail commission" based upon the cash value of the policy going forward, in exchange for servicing the policy. Tr. Vol. IA at p. 55.  Lawson testified that a typical trail commission is less than one third of one percent. Tr. Vol. IA at p. 56.  This trail commission is the profit that the parties were splitting. Giordani testified that Osborne Lowe held a 50% "profits interest" in the trail commissions from IDI. Tr. Vol. IB at p. 93.

IA at p. 47-48.[6]  IDI continued to pay out 31% of the profits on PPLI business referred to it by Giodani to Giordani in the form of legal fees to GSBT.  Tr. Vol. IA at p. 49; Tr. Vol. IB at p. 97. The treatment of these payments was unusual.  GSBT billed IDI in three ways—one file for legal work including marketing for IDI, one for performing administrative functions for IDI, and a "retainer" file.  Plaintiff's Exhibit 1;Tr. Vol. IB at p. 96; Tr. Vol. IA at p. 49.  GSBT would occasionally add an amount to the "retainer" billing equal to the profits due under the oral profit-sharing agreement.  Tr. Vol. IA at p. 49.  Lawson testified that at one point GSBT had an employee officing at WCL providing administrative support to IDI, and that GSBT paralegals handled all of IDI's accounting.  Tr. Vol. IA at p. 49;  Tr. Vol. IB at p. 101.  This employee's services were billed to IDI through the administrative file.  Tr. Vol. IB at p. 101.  This payment arrangement continued for about three years.  Plaintiff's Exhibit 5; Tr. Vol. IB at p. 100.  During that period, IDI brokered several OPPLI transactions, many with clients of GSBT, including Frederick DeLuca ("DeLuca"). Tr. Vol. IA at p. 51; Tr. Vol. IB at p. 95.

    In 2002, the principals of IDI decided that they were not comfortable with continuing the profit-sharing arrangement in its present form.  Tr. Vol. IA at p. 49, 54.  Lawson testified that IDI's principals had concerns about the fact that the profits paid to Giordani were too big to be justified as legal fees, that they were paying a profits interest as legal fees, and about whether GSBT's clients were informed about the profits payments to GSBT.  Tr. Vol. IA at p. 54.  Bill Waxman testified that "we were warned before we went into this, by Jim Shawn, that our arrangement was fine, but if the profits got to be too much, he didn't think it would be a proper arrangement; he had written this in

_____

    [6]There was some confusion in the testimony regarding whether the interest was a 25% interest, or a 31% interest.  Giordani testified at trial that it was a 31% interest in the net profits of IDI.  Tr. Vol. I B at p. 94.

a memorandum he had sent us in 1999." Tr. Vol. III at p. 44.  Lawson approached Giordani in the late summer or fall of 2002 about entering into a formal written agreement to address the payments.[7] Tr. Vol. IB at p. 111.  This ultimately resulted in Waxman and Giordani negotiating the terms of a written agreement to address the continued payment of the amounts IDI had been paying pursuant to the oral agreement.  Tr. Vol. IA at p. 52; Tr. Vol III at p. 45.

As part of the negotiations, Giordani decided that the recipient of the payments should not be her or her law firm, but rather should be a separate entity, Edgewater Consulting Group, Ltd. Giordani originally formed Edgewater in 2001 as part of a tax planning strategy related to the treatment of GSBT's profits interest in IDI, in the event of a sale of IDI.  Plaintiff's Exhibit 2; Tr. Vol. IB at p. 100.  Edgewater was a British Virgin Islands entity owned by Giordani, Schurig, and Beckett.  Tr. Vol. IA at p. 53; Tr. Vol. IB at p. 100. IDI was represented in the negotiations by Jim Shawn, whose role was primarily to review the Agreement and consult with Waxman.  Plaintiff's Exhibit 23; Tr. Vol III at p. 48.   Giordani provided most, if not all, of the representation for Edgewater on its side of the negotiations.  The agreement the parties ultimately signed was titled a "Consulting and Policy Services Agreement" ("CPSA"), is dated December 31, 2002, and is found at Plaintiff's Exhibit 24.[8]

One of the challenges the parties faced in their negotiations is that they in essence were attempting to continue the payment scheme they had engaged in for the past two years, but—for

_____

[7]Giordani testified that she believed the reason behind the change was that WCL was interested in cutting off her interest in IDI.  Tr. Vol. IB at p. 112.

[8]At the same time the parties entered into the CPSA, IDI and GSBT entered into an Attorney Services Agreement whereby IDI agreed to pay GSBT a monthly retainer of $1,000 for sixty months, and GSBT was to remain IDI's attorney and available for legal advice and consultation.  Plaintiff's Exhibit 25; Tr. Vol IB at p. 120.

reasons discussed above—they did want to reduce that specific agreement to writing.  Eventually they decided upon a structure which required IDI to pay 50% of the income it received (in the form of commissions) on the policies that had originally been referred by Giordani (and her partners), which were listed in Appendix II to the Agreement.  Plaintiff's Exhibit 24 at ¶ 3.1.[9]  Appendix II was essentially a snapshot of the existing book of business GSBT had referred to IDI—and on which IDI was sharing its commissions with GSBT—as of the date of the agreement.  Tr. Vol IA at p. 58.  In this respect, then, the agreement reflected essentially what in fact had been happening up to that time as far as payments were concerned.  What was new and different in the CPSA is that it imposed obligations on Edgewater, something that did not exist (at least in any obvious fashion) prior to the CPSA.  First, the contract required Edgewater to provide policy services[10] on a defined list of OPPLI policies, listed on Appendix I to the Agreement.  *Id.* at Article I.  Second, Edgewater agreed to "consult with IDI from time to time and as reasonably required by IDI in connection with issues related to private placement life insurance."  *Id.* at Article II.  Plaintiff's Exhibit 24; Tr. Vol IA at p. 58, 60.  The contract is silent regarding any obligations with respect to any future business IDI, GSBT or Edgewater might do together. As noted, earlier, Giordani believed that the reason IDI

---

[9]In addition, Edgewater was to receive 50% of IDI's income from a marketing agreement IDI had with AIG Bermuda.

[10]Private placement life insurance policies require continued administrative servicing after placement.  The broker typically provides such administrative servicing on the policies, and in turn for performing such servicing, the broker receives trail commissions.  IDI claims that the mutual clients of IDI and GSBT wanted the lawyers to do the required servicing so that the clients could save attorney's fees.

wished to enter into the CPSA was to cut off her interest in IDI, and this silence equated to IDI no longer having an obligation to share commissions on future business referred by GSBT.[11]

It is worth pausing here to note several points. Prior to the written agreement, GSBT owned what it believed was a legal and enforceable right to receive 31% of all of the trail commissions that IDI earned on the OPPLI policies IDI had brokered for clients Giordani and her partners had referred to IDI. IDI apparently agreed with this, as it systematically paid those amounts to GSBT without objection. And according to the testimony, GSBT owed IDI little or nothing in return for these payments. The parties were never comfortable with this state of affairs, however, as they always couched the payments as "attorney's fees" or "retainers," though there is little if any evidence to support this characterization of the payments, and certainly no testimony to suggest that anywhere near the several million dollars of commissions IDI shared with Osborne Lowe, Giordani, and GSBT was returned to IDI in the form of legal services. The fact of the matter is that the payments were from the start one thing and only one thing—a referral fee (or, more pejoratively, a kickback) to the lawyers for sending millions of dollars of insurance business to IDI. And the further fact of the matter is that the CPSA was written in an attempt to make these payments more "justifiable" than they otherwise were appearing in 2002. Thus, although it was entitled to the payments by doing nothing, when the CPSA was signed, GSBT, through Edgewater, agreed to assume policy servicing and consulting obligations, albeit for an increase in the amount of the percentage from 31% to 50%. The Court's view of the evidence is that it was primarily at the behest of IDI, and its concern about appearances, that Edgewater and Giordani agreed to these changes. One other material change to

---

[11]Perhaps not surprisingly, after the CPSA was signed, IDI only brokered two new policies for GSBT clients. Tr. Vol. IB at p. 122.

the arrangement is notable.  Prior to the CPSA, IDI's payments were made directly to the lawyers at GSBT, and were characterized as attorney's fees.  The agreement changed this by making Edgewater the payee.  Although owned by three of the four partners of GSBT, Edgewater was not a law firm; indeed it was a shell corporation created initially for a different purpose.  If nothing else, making the payments due to Edgewater further obscured the true nature of the financial arrangement between IDI and GSBT.  The relevance of all of these observations is that the evidence strongly suggests that the CPSA was created more to provide protection to one or more parties concerned about the appearance of their arrangement, than it was to document sincere obligations.[12]

Regardless, for more than five years, from January 1, 2003, until April 30, 2008, the parties had no disagreements regarding their respective performances under the CPSA.  IDI paid Edgewater 50% of the trail commissions it received on the policies listed in Appendix II, and, as long as the AIG marketing agreement was in place, 50% of IDI's receipts under that agreement.  Tr. Vol. IB at p. 35.  Edgewater, through contracted services provided by GSBT, serviced the policies listed in Addendum I, and claims also to have provided consulting services when requested.  Neither party complained of any breach by the other during this time frame.

Two events of significance took place during this period, however.  First, in 2003, IDI entered into a joint venture with another insurance brokerage, the Winged Keel Group, and created an entity called "Winged/Keel IDI."  Together they started SALI Fund Partners, LLC ("SALI").  Tr.

---

[12]As noted, IDI's obligation to share its commissions with the lawyers, while somewhat camouflaged (and now indirect), remained in the deal.  It is not at all clear that the contract the parties entered into originally is something that either the State Bar of Texas or the Texas Department of Insurance would permit, and it is also unclear whether the "reformed" agreement cured any problems in that regard.  But neither party has objected to the contract on any such ground, and no argument has been raised that the contract is unenforceable as against public policy.  That issue is thus not before the Court.

Vol IB at p. 39.  SALI was an investment platform intended to allow investment managers to create an insurance-dedicated fund affording the tax breaks permitted life insurance under the Internal Revenue Code.  Tr. Vol.  III at p. 139.  Through this venture, IDI planned to get into the investment or hedge fund management business, so it could gather assets under management and garner fees from those assets. Tr. Vol.  II at p. 185; Tr. Vol.  III at p. 139.  Giordani was not pleased with IDI's plans in this regard, and testified that she met with Lawson prior to June of 2004 to discuss her concerns that IDI's perception in the marketplace was being diminished because of its relationship with Winged Keel, and that this was causing their share of the PPLI market to dwindle.  Tr. Vol. II at p. 240. Lawson's testimony confirmed that in early 2003 he was spending the majority of his time working on the Winged Keel/IDI SALI joint venture.  Tr. Vol IB at p. 40.  He testified that Giordani did in fact express concerns about IDI's attention to GSBT clients at this time. Tr. Vol IB at p. 41.  Lawson testified that Giordani related concerns to him about WCL being both insurance brokers and hedge fund managers with the SALI fund and how that would be negatively perceived in the investment advisor community. Tr. Vol IB at p. 41; Defendant's Exhibit 52.  Giordani testified that in 2003, Lawson became difficult to reach by phone and was not returning e-mails.  Tr. Vol.  II at p. 186.  Lawson also agreed that Giordani informed him that investment managers refused to work with her GSBT clients if she worked with IDI because IDI was essentially competing with these managers.  Tr. Vol IB at p. 42.  Giordani testified that this was potentially harmful to her GSBT clients, because her clients would no longer have access to the best hedge fund managers if IDI brokered an OPPLI deal.  Tr. Vol.  II at p. 189.

Second, in early 2004, GSBT notified IDI that it was reducing the IDI retainer to $500 per month. Plaintiff's Exhibit 36.  Shortly thereafter, in a letter dated January 30, 2004, GSBT notified

IDI that it had decided to terminate GSBT's representation of IDI altogether, retroactive to January 1, 2004. Plaintiff's Exhibit 15. This termination date was not arbitrary. In January 2004, Giordani had decided to create another Bermuda-based insurance brokerage. To do so, she brought together two individuals and assisted them in forming Insurance Placement Services (Bermuda) Ltd. ("IPS"). Tr. Vol. IB at p. 126-127. IPS, like IDI, would be an offshore brokerage capable of brokering PPLI policies. IPS and Edgewater entered into an agreement in which Edgewater would receive 75% of IPS's commission income for servicing policies that IPS brokered. Tr. Vol. II at p. 17. IPS only brokered policies for GSBT clients. Tr. Vol. IB at p. 129. After the creation of IPS, Giordani represented several prior clients in creating additional policies, but placed these policies with IPS not IDI, Tr. Vol. IB at p. 128, and did not participate in any new OPPLI transactions in which IDI was the broker. Instead, IPS acted on the broker on all such policies. Tr. Vol IA at p. 65.

The disagreements that had been bubbling beneath the surface came to a head in April 2008, as a result of complaints that IDI received from Frederick DeLuca, one of the insureds under several of the OPPLI policies covered by the agreement. With Giordani representing him, DeLuca had funded several OPPLI policies insuring himself and his family members, and IDI acted as the broker on these policies.[13] After IPS was formed, she represented DeLuca and his family members on additional policies, and on these occasions used IPS as the broker. Apparently upset when he learned that IDI and IPS were sharing trail commissions with GSBT or entities owned by GSBT,[14] DeLuca's

---

[13]The funding of a PPLI or OPPLI policy is a complex transaction, involving among other things the creation of a trust, which is the entity that actually owns the policies. The Court at times in this opinion ignores these details as they are not germane to the issues before the Court.

[14]The parties dispute whether GSBT had ever disclosed to its clients the nature of its commission-sharing arrangement with IDI. There was no evidence presented to demonstrate whether such disclosures were or were not ever made.

representatives directed IDI to see to it that Edgewater no longer serviced or received income from these policies. Tr. Vol. IA at p. 72**.**   Thus, on May 23, 2008, IDI informed Edgewater that Edgewater should no longer service DeLuca's policies and IDI would no longer pay Edgewater 50% of the trail commissions on those policies. Plaintiff's Exhibit 12.[15]  Edgewater claims that the monthly payments from IDI dropped from $140,000 per month to approximately $75,000 per month after this.  Tr. Vol. II at p. 176.   IDI began placing the monies formerly paid to Edgewater on DeLuca's policies in a Compass bank account, holding these funds in "trust" or "escrow."    Tr. Vol. IA at p. 74; Defendant's Exhibit 169.[16]  Then, in October 2008, Lawson sent Edgewater an e-mail informing it that IDI was decreasing the compensation to Edgewater again, this time to approximately $50,000 per month**.** Tr. Vol. IB at p. 35;  Plaintiff's Exhibit 20.  The reason given was that IDI would henceforth only be paying Edgewater for policies that were being serviced by Edgewater.  Plaintiff's Exhibit 20.[17]

DeLuca apparently became aware of the commission sharing when, in 2007 or 2008, his representatives were investigating purchasing additional private placement life insurance on his wife's life.  DeLuca had hired a new "home office manager" who had previously worked with a Connecticut law firm. When the topic of new PPLI policies arose, the manager contacted an attorney from this firm, who had a relationship with Winged Keel, and she asked Winged Keel to evaluate

---

[15]IDI took over the servicing of those policies.  Tr. Vol. IA at p. 73.

[16] The evidence shows that WCL withdrew $180,000.00 from this account on January of 2009 and returned the money to the account in October 15, 2009.  Defendant's Exhibit 169.

[17]In November of 2009, Lawson notified Bob Chesner via e-mail that Edgewater was no longer to service two additional policies, those relating to Theresa Castellano and Benjamin Wood, and that IDI would no longer pay Edgewater on those policies.  Plaintiff's Exhibit 30;  Tr. Vol. IA at p. 83.

placing the policies, apparently with a view toward comparing policies offered through Giordani and IDI or IPS with other providers.  Through conversations with other brokers, Lawson became aware that other entities were re-evaluating the DeLuca business and he became concerned that IDI might lose the business.  He testified that he called Leslie Giordani about this, and she assured him that there was no problem with the client.  Apparently in the process of inquiring into the pricing and terms of the past policies, DeLuca's office manager learned of the CPSA, and the sharing of commissions.  Ultimately, DeLuca fired GSBT and hired the Connecticut law firm, Tr. Vol. II at p.212;  Tr. Vol. II at p. 216, and eventually Winged Keel, IDI's former joint venture partner, won DeLuca's new PPLI business.  Tr. Vol.  II at p. 184.

With the exception of the instant dispute, the unwinding of all of these relationships took place at the end of 2008 and the beginning of 2009.  Agreements were ultimately reached between IDI and DeLuca, between DeLuca, GSBT and Edgewater, and between IDI and GSBT.  As between IDI and DeLuca, in the negotiations, DeLuca's attorneys informed IDI that DeLuca was considering completing a "1035" of his policies (basically a non-taxable swap of an old policy for a new policy), which would mean that IDI might no longer collect trail commissions on his policies.  Tr. Vol. IB at p. 63.  DeLuca also threatened to sue IDI in Bermuda for breach of fiduciary duty.  Tr. Vol. IA at p. 22;Tr. Vol. IB at p. 63.  Ultimately, IDI agreed to give up its trail commissions on the DeLuca policies, and DeLuca paid IDI an amount in exchange for IDI surrendering this interest in the policies and to settle all of their disputes.  Plaintiff's Exhibit 28;  Tr. Vol. IA at p. 79. The agreement specified that payment was to be made on January 1, 2009.  DeLuca further agreed to indemnify IDI if IDI was obligated to share with Edgewater any of portion of the amount he was paying IDI to terminate its commission interest.   Tr. Vol. IB at p. 49; Plaintiff's Exhibit 28 at ¶ 1.  AIG also

13

negotiated a new arrangement with DeLuca in which he received certain discounts or price concessions. Defendant's Exhibit 164. With regard to the claims against the attorneys and Edgewater, DeLuca entered into an agreement with GSBT and Edgewater (and their principals) in which he received a sizeable payment, in exchange for which he released any claims he may have had against them, including claims for breach of fiduciary duty. This agreement included a provision in which Edgewater expressly waived any right to "any compensation related to the DeLuca Family Policies that accrues after December 31, 2008." Plaintiff's Exhibit 13 at ¶ 2.

This suit was filed in October 2008, and named as defendants Edgewater, Giordani, and GSBT. Among other things, the complaint made claims against Giordani and GSBT for breach of fiduciary duty as a result of the attorney/client relationship that existed between IDI and GSBT, and also included a fraud claim. The parties have since settled these non-contract claims, and in September 2009, they filed an Agreed Stipulation and Motion to Dismiss in Part (Clerk's Doc. No. 76), agreeing that only the following issues remain for the Court's determination:

> (a) Edgewater Consulting Group, Ltd.' s counterclaims against IDI for breach of contract, money had and received, and constructive trust as set forth in that pleading captioned Edgewater Consulting Group, Ltd., Leslie Giordani, and Giordani, Schurig, Beckett & Tackett, LLP's Answer to Plaintiff's First Amended Complaint and Counterclaim of Edgewater Consulting Group, Ltd., filed on or about June 4, 2009; and

> (b) IDI's claims against Edgewater for breach of contract and declaratory judgment, as set forth in that pleading captioned Plaintiff's First Amended Complaint, filed on or about May 19, 2009.

## II.    Conclusions of Law

At least from a legal standpoint, the competing claims before the Court are straightforward. Edgewater claims that IDI breached the CPSA when it stopped making all of the payments called

for in that agreement. IDI asserts that its performance under the agreement was excused because Edgewater itself breached the contract by failing to provide the required consulting and servicing obligations. IDI also asserts that because the CPSA has no stated term, it becomes a contract terminable at will, and IDI terminated the agreement in either May 2008, when it gave Edgewater notice that it would no longer pay the amounts due on the DeLuca policies, or in October 2008, when it further limited the policies on which it would make payments. One thing is not in dispute: beginning in May 2008, IDI did not make all of the payments to Edgewater that were due on the face of the agreement. Thus, unless IDI succeeds on its claim that its performance was excused by Edgewater's breach, or that the contract was terminable at will and was terminated, IDI is in breach of the agreement.[18]

The final claim before the Court is Edgewater's contention that the settlement payment that IDI received from DeLuca when IDI agreed to relinquish its right to future commissions on his policies was effectively an insurance commission, and thus Edgewater is entitled to 50% of this payment under the CPSA.

---

[18]IDI's briefing, which is not a model of organization, makes several other arguments that the Court need only address briefly here. First, IDI asserts that Edgewater breached the confidentiality provision of the CPSA, when it disclosed the terms of the CPSA while recruiting Bob Chesner, and when Chesner, as President of Edgewater, revealed certain matters contained within the CPSA to clients Theresa Castellano and Benjamin Wood. As Edgewater points out, this claim has never been raised before, and the Court thus deems it untimely. Further, IDI's counsel has admitted that this claim was essentially subsumed within the breach of fiduciary duty claim IDI has already settled with GSBT. Second, IDI asserts that Edgewater failed to comply with the CPSA requirement that  a notice in the form attached as Appendix IV to the CPSA be sent to each policyowner covered by the CPSA. This claim was also not raised prior to trial, and thus is not properly before the Court. Moreover, the only evidence before the Court on this point is Giordani's testimony that Edgewater sent out the required notices for each policy issued  after the CPSA went into effect. Tr. Vol. II at p. 180-82, 226.

### A.      IDI's Claim that Its Performance Was Excused by Edgewater's Breach

IDI asserts that Edgewater breached the CPSA in two ways: first, by failing to provide the consulting services called for under the CPSA, and second, by failing to provide the policy servicing required by the CPSA.  On the consulting side of things, IDI cites to a litany of acts or omissions by Edgewater that it contends amount to violations of the consulting clause.  These include failing to inform IDI about its formation of IPS; failing to help IDI maintain the DeLuca business; failing to warn IDI about the potential loss of the Buck business; failing to inform IDI about a client's IRS audit, and disparaging IDI to another attorney in the estate-planning business.[19]  On the policy servicing side of things, IDI does not claim that the servicing did not take place, but rather contends that GSBT, not Edgewater, provided the services, and that this was a breach of the CPSA.

### 1.      IDI's Claims of Failure to Consult

The relevant language of the CPSA with regard to consulting is very brief, and is found in the two paragraphs of Article II:

> 2.1    Scope of Consulting Services. Edgewater shall consult with IDI from time to time and as reasonably required by IDI in connection with the issues related to private placement life insurance, including, but not limited to, life insurance separate account investments, life insurance tax compliance matters, and matters of interest and importance to the client market for private placement life insurance.

---

[19]Edgewater asserted in its post trial brief that IDI had waived its defense of prior breach because IDI continued to perform under the CPSA after the breaches of which it complains. Edgewater argues that IDI paid Edgewater in full until May of 2008 and paid a portion of what was owed thereafter up until the time of trial.  *See* Defendant's Post-Trial Brief at p. 10.  The facts reflect, however, that, at least by the time this suit was filed in October 2008, IDI was asserting that Edgewater was in breach of its obligations.  As full payments ceased only a few months earlier in May 2008, the Court rejects this waiver argument.

>　2.2　<u>Limitation</u>.  IDI acknowledges and agrees that in connection with consulting
>　　　services provided by Edgewater under this Agreement that Edgewater is not
>　　　acting as IDI's lawyer or in any other capacity requiring licensure.

Neither party contends that this language is ambiguous, although they do disagree regarding whether

the "from time to time" clause of ¶ 2.1 is to be read independently of the "and as reasonably

required" clause, such that Edgewater had a duty to both consult when "reasonably required," and

also from "time to time."  The Court finds that the plain language of the contract, and particularly

the use of the conjunctive "and," means that Edgewater had a dual duty to consult both from time

to time, and whenever it was reasonably required to do so.

With regard to affirmative requests for services, IDI concedes that it never specifically made

a request of Edgewater for consulting services. For example, Waxman testified that neither he nor

IDI ever requested that Edgewater consult with IDI. Tr. Vol. III at p. 95-96.  Lawson testified that

Edgewater did provide consulting to IDI and there was never an occasion when IDI requested

consulting from Edgewater that it was not provided.  Tr. Vol IB at p. 15.  Giordani confirmed that

Edgewater never refused a request from IDI for consultation, and testified that IDI never complained

about an alleged failure to consult, and never claimed, prior to suit, that Edgewater had breached the

CPSA by not consulting with IDI as required.  Tr. Vol.  II at p. 173.

Further, IDI does not claim that Edgewater never consulted with IDI on the topics addressed

in ¶ 2.1.  Such a claim would fall flat, because there was ample evidence of meetings, discussions,

and communications, primarily between Giordani and Lawson, that clearly qualify as consulting

under the agreement.[20]  The consulting clause makes no attempt to quantify the amount of consulting

---

[20]During trial and in its briefs, IDI often made comments regarding the fact that it was unclear
when Giordani was wearing her "GSBT hat" and when she was wearing her "Edgewater hat."  While
the Court agrees that such distinctions were often blurred, the evidence shows that this was not

services required, and, as set out in the fact findings, the parties did not place much emphasis on this clause when the CPSA was negotiated.  Notwithstanding this, there was much evidence of consulting taking place.

For example, Edgewater offered e-mails showing that Giordani was helping Lawson with business opportunities for IDI.  Tr. Vol. IB at p. 30; Defendant's Exhibit 43; Defendant's Exhibit 64; Tr. Vol.  II at p. 236. The evidence also showed that Giordani mailed Lawson newsletters containing information relevant to IDI's business,  Tr. Vol. IB at p. 31; Defendant's Exhibit 56;  kept Lawson abreast of Chesner's change in position and AIG abreast of their special deal with IDI,  Tr. Vol. IB at p. 32;  Defendant's Exhibit 59; and consulted on premium negotiations with AIG for one of her GSBT clients, Defendant's Exhibit 79.  *See also* Defendant's Exhibits 43, 52, 56, 59, 64, 72, and  79.  Further, as set out in the findings of fact, Giordani also consulted with IDI by advising them of the problems she perceived being created by IDI's involvement with the Winged Keel/SALI business.  Giordani testified that she consulted with Lawson about his need to focus on PPLI and about the perception that IDI was double dipping by entering the hedge fund arena. Tr. Vol.  II at p. 233.  While IDI no doubt disagreed with this advice, it nevertheless would seem to qualify as "consulting" on strategic business issues related to PPLI.  Further, in 2003, Leslie Giordani and John Lawson gave joint presentations on OPPLI at a conference of professional insurance advisors. Defendant's Exhibit 89;  Tr. Vol. IA at p. 98.  Lawson testified that he and Giordani worked as a team.  Tr. Vol. IA at p. 98.  Lawson testified that in June 2004, June 2005, February 2006, and

something that troubled the parties at the time the events were taking place.  IDI itself had no employees, and acted only through the contracted services of others, including GSBT at times. When IDI entered into the CPSA, it was aware that Edgewater was a shell corporation without employees, owned by three of the four GSBT partners, and thus knew that any consulting services Edgewater provided would have to be provided by Giordani or others at GSBT.

February 2007, he was invited to speak at various conferences involving investing through life insurance, and that Giordani was the chairperson of these conferences. Defendant's Exhibits 92, 93, 94, and 95.  IPS was not represented at these conferences.  *Id.*  From this evidence, there can be no doubt that Edgewater did in fact provide consulting services to IDI throughout the time the CPSA has been in effect.

The meat of IDI's failure to consult argument is really its complaint of all of the things that Edgewater failed to do, or things that it was doing but failed to disclose to IDI.  These include failing to inform IDI about the formation of IPS, failing to help it maintain the DeLuca business (or affirmatively referring that business to IPS), failing to warn IDI about the loss of the Buck business, and failing to inform IDI about a client's IRS audit.[21]  In these arguments, IDI is attempting to read into the consulting clause something much more akin to a duty to disclose, a duty of loyalty, or a fiduciary duty.  None of these is consistent with the language of the CPSA, or the parties' discussions leading up to the agreement.  Further, the argument attempts to conflate Edgewater and GSBT, as many of the complained of actions were taken by GSBT, not Edgewater.  On this last point, IDI "acknowledged and agreed" that when Edgewater was providing consulting services under the agreement it was "not acting as IDI's lawyer."  Plaintiff's Exhibit 24 at ¶ 2.2.  Thus, the agreement itself recognized that the consulting services did not carry with them the sort of fiduciary duties that an attorney would owe to IDI.

---

[21]IDI also complains that Giordani (and therefore Edgewater) disparaged IDI to another attorney in the estate-planning business.  The evidence submitted on this claim failed to demonstrate that IDI was in fact disparaged.  Moreover, as set out below, the consulting agreement cannot be read to create the type of duty on which this claim rests.

Moreover, the evidence at trial demonstrated that IDI never contemplated the consulting clause requiring the sort of disclosures it now contends Edgewater was required to make.  For example, in Defendant's Exhibit 5, an e-mail from Lawson to Giordani discussing the negotiation of the CPSA, Lawson states that:

> this arrangement does not assume any other relationship between our firms other than those laid out in the agreements.  We hope that you will choose to use IDI for your future offshore cases and we hope to use GSBT as the legal advisor on any future business that we are able to turn up.  However, there is no requirement for GSBT to use IDI nor is there a requirement for IDI to use GSBT on future cases.

In Defendant's Exhibit 31, Lawson states that going forward, business would be done on a "Best Choice of Provider" basis, meaning each party could choose who they wished to use for insurance, consulting, or legal services.  Lawson agreed at trial that GSBT was free to use whatever broker it wanted for its clients and that IDI could use any law firm it desired. Tr. Vol IA at p. 101.  Waxman testified that the CPSA does not say that GSBT or Giordani is required to refer new business to IDI. Tr. Vol. III at p. 94.  With regard to GSBT's creation of IPS, in an e-mail dated February 2004, Lawson states "You may have found a new broker in Bermuda—and obviously, that is your business decision which you are completely free to make." Plaintiff's Exhibit 16, GSBT-IDI 000744.[22]  Given all of this evidence, the consulting clause simply cannot be read to require the sort of disclosures that IDI now complains were lacking.[23]

---

[22]There was substantial testimony suggesting that as early as 2004 Lawson and IDI were well aware of the possibility of there being a competing brokerage that GSBT was using.  *See, e.g.* testimony at Tr. Vol.  II at p. 199-200; Tr. Vol. III at p. 131; Tr. Vol. IB at p. 18.  Thus IDI's claim that it did not know of IPS until 2008 is not supported by the evidence.  And because the Court rejects IDI's claim that Edgewater had a duty to disclose IPS's existence to IDI, it need not address the statute of limitations argument Edgewater raises on this claim.

[23]And as noted earlier, IDI brought suit against Giordani and GSBT for these very sort of claims, and settled those claims prior to this trial.  The Court views the failure to consult arguments

The result is the same with regard to the argument that Edgewater breached the consulting clause by failing to help IDI retain the DeLuca book of business and the business of DeLuca's business partner, Peter Buck.  IDI's main assertion seems to be that Edgewater breached the CPSA because its principals sent new DeLuca business to IPS without disclosing this to IDI.  Again, this conflates GSBT and Edgewater, which IDI acknowledged would not be providing legal services. The parties clearly understood that GSBT (not Edgewater) referred business to IDI, and as explained above, the parties agreed at trial that GSBT was free to send its business to the "best choice of provider."  The testimony of all parties was that the CPSA did not reference future business. Tr. Vol. III at p. 51; Tr. Vol. IB at p. 119.  The evidence also established that IDI did in fact retain all of the DeLuca business it had when the CPSA was signed.

With regard to the Buck policies, even assuming Edgewater had a duty to consult with IDI about Dr. Buck's decision to surrender those policies, the evidence demonstrated that they did in fact do so. Lawson testified at trial that in October of 2006, Bob Chesner, still employed at AIG at this time, notified Lawson that Buck was surrendering two OPPLI policies.  Plaintiff's Exhibit 22; Tr. Vol IA at p. 85.  While Lawson testified that Edgewater did not inform him that there were any problems with the Buck policies prior to their surrender, Tr. Vol IA at p.86, Giordani testified that in September 2006, she contacted Lawson about various concerns that Peter Neufeld, the head of Dr. Buck's family office, had about the Buck policies.  Tr. Vol. II at p. 227; Defendant's Exhibit 115. More to the point, Lawson testified that the Buck policies were not actually surrendered until

---

here to be an attempt to raise the same arguments again.

December 2006, Tr. Vol. IB at p. 51,[24] and that he called Neufeld twice before the policies were officially surrendered, but was unsuccessful in getting Buck to change his mind.  Bob Chesner, then with AIG, did the same. Tr. Vol. IB at pp. 54-57; Tr. Vol. II at p. 231.  Thus, to the extent that there was a duty to consult on this issue, Edgewater appears to have fulfilled that duty.[25]

In sum, the consulting agreement—an obligation that was added late in the negotiation of the CPSA—cannot carry the water that IDI asks it to carry.  The plain language of the clause does not require the sort of duties that IDI now claims it contains.  For the five years before DeLuca raised his objections to the parties' arrangement, IDI never raised an objection about how Edgewater was performing with regard to consulting, and the parties' statements to each other regarding their mutual rights to do business with others as they saw fit belie the claim that IDI now makes.  The evidence demonstrates that Edgewater did in fact provide the kind of consulting that the CPSA required.  The Court therefore rejects IDI's claim that its obligation to make payments under the CPSA was excused by Edgewater's breach of the consulting provisions of the agreement.

### 2. IDI's Claim of Failure to Service the Policies.

IDI also asserts that Edgewater breached the policy servicing requirements of the CPSA.  Notably, IDI does not claim that the policies were not serviced.  Rather, IDI asserts that *Edgewater*

---

[24] Giordani testified that one policy was surrendered December 6, 2006, and one on February 22, 2007.  Tr. Vol. II at p. 231.

[25] IDI's final claim that Edgewater breached the consulting agreement by failing to disclose that one of the policyholder's policies had been audited by the IRS merits only minor mention.  The representation of the policyholder on the audit was provided by one of the GSBT lawyers, and thus information related to that audit would have been covered by the attorney/client privilege.  Moreover, even if the contract were read to require a disclosure to IDI by Edgewater of the audit, it is clear that—in view of all of the other consulting that Edgewater did provide—such a minor transgression would not have been sufficient to permit IDI to cease making payments under the CPSA.

did not provide the servicing because all the servicing originated from GSBT, and also because clients were billed separately by GSBT for this servicing in the form of legal fees. *See* Plaintiff's Post-Trial Brief at p. 13. IDI also alleges that by its actions, Edgewater assigned the servicing obligations to GSBT, which is prohibited by the CPSA.

The argument that Edgewater's lack of employees means it could not have serviced the policies is easily disposed of. Edgewater concedes that it had no employees and paid GSBT employees to service the policies. IDI fails to point to any provision in the contract that this violates, however. Waxman conceded that the CPSA did not require Edgewater to have employees. Tr. Vol. III at p. 94. He also testified that IDI has no employees. *Id.* Given that it was known to IDI that Edgewater was a shell corporation without employees, the Court can infer that IDI knew when it entered into the CPSA that the policy servicing would have to be done by a third party. Indeed, prior to the CPSA, GSBT employees serviced policies for IDI, and then billed the costs to IDI as legal fees. Tr. Vol. IB at p. 96; Tr. Vol. IA at p. 49. It should thus have come as no surprise to IDI that something similar was done when Edgewater took over the servicing obligation. Contracting the servicing obligations out to a third party did not violate the CPSA.

IDI alternatively argues that by contracting with GSBT to provide the policy servicing, Edgewater effectively assigned its servicing obligations to GSBT, which violated ¶ 6.2 of the CPSA.[26] An "assignment" is a legal transfer of some right or interest. *See Pagosa Oil & Gas, L.L.C. v. Marrs & Smith P'ship*, No. 08-07-00090-CV, 2010 Tex.App. LEXIS 938 at *10, 2010 WL 450910 (Tex. App. – El Paso, Feb. 10, 2010, no pet. h.) (citing *University of Texas Med. Branch at*

---

[26]That clause states in relevant part: "Neither Party shall be permitted to assign its rights or obligations under this Agreement without the express written consent of the other Party."

*Galveston v. Allan*, 777 S.W.2d 450, 452 (Tex. App. – Houston [14th Dist.] 1989, no writ)).  When an assignment takes place, the assignor generally loses all control over the matter or thing assigned. *Id.* at 454.  There was simply no evidence offered at trial that any such agreement was reached between Edgewater and GSBT with regard to the policy servicing obligations of the CPSA, and there was no evidence that Edgewater gave up all control over the servicing obligations when it hired GSBT.  Rather, the evidence at trial shows that GSBT was merely hired at an hourly rate to service policies.  This is not an assignment under Texas law.

Finally, IDI claims that Edgewater could not be servicing the policies because GSBT was charging clients for servicing the policies.  There was no evidence at trial to support this claim, however.  Rather, the only record evidence on this point is the testimony of Giordani, Bob Chesner and Elizabeth Schurig, all of whom testified that GSBT employees followed clear standards about billing policy servicing work to Edgewater and legal services to clients.  Tr. Vol. II at p. 75-76, 122; Tr. Vol. III at p. 142-43.  The testimony established that GSBT charged clients for legal services and Edgewater for policy-specific functions. Tr. Vol. II at pp. 122-26.  Given this state of the evidence, this claim has no merit.

As with the claim that Edgewater failed to consult as required under the agreement, IDI's claim that Edgewater failed to service the policies as required appears to be an after-the-fact creation to excuse its decision to stop making payments at the insistence of an important and influential client.  There is no doubt that the policies were serviced, and the manner in which Edgewater accomplished this did not violate the CPSA.

24

**B.      Is the CPSA Terminable At Will?**

IDI's final argument to prevent a finding of breach is that the CPSA was terminable at will, and that it effectively terminated the agreement when it gave IDI notice that it was going to stop making payments as the contract required.

IDI correctly notes that the CPSA has no stated term or duration.  The only language of the agreement on termination is:

> 6.1      Termination of Agreement.  This Agreement may be terminated only upon the prior written consent of both parties.

Plaintiff's Exhibit 24 at ¶ 6.1.  Edgewater weakly attempts to argue that this clause is a termination clause, and thus the CPSA is not a contract without a stated term.  This claim barely merits response. Clearly, the statement that the contract can only be terminated when all parties agree means that the contract can last indefinitely, at the election of either party.  Thus, the CPSA contains no stated term. The issue the Court must decide is what the legal significance of this fact is.

Texas law on this issue is not well-developed.  The general rule is that a services contract that does not contain a definite term is by law a contract at will.  *Trient Partners I, Ltd. v. Blockbuster Entm't Corp.*, 83 F.3d 704, 708 (5th Cir.1996); *Wimer v. Holzaplfel*, 868 F. Supp. 844 (E.D. Tex. 1994).  Contracts at will are terminable at any time, by either party.  *Ichiban Records v. Rap-A-Lot Records*, 933 S.W.2d 546 (Tex. App.– Houston [1st Dist.] 1996, no pet.). IDI places primary reliance for their argument on *Clear Lake City Water Authority v. Clear Lake Utilities Company*, 549 S.W.2d 385 (Tex. 1977).  The general holding of *Clear Lake* is consistent with the general rule set out above—a contract that is for an indefinite term is considered terminable at will.  *Id.* at 390-91.  It also recognized an exception to this rule for contracts involving exclusive franchises or distributorships, where courts could imply a term of reasonable duration.  *Id.*  IDI argues that this

25

is the only exception to the general rule. But many years prior to *Clear Lake* the Texas Supreme Court recognized a broader exception than this, holding in *Hall v. Hall*, 308 S.W.2d 12, 16 (Tex. 1957), that in contracts generally, a term of reasonable duration may be implied where no such term is stated. *Clear Lake* did not overrule *Hall*, and many Texas courts have found that reasonable terms may be implied into agreements that have no stated duration. *See, e.g.*, *Marshall v. Marshall*, 735 S.W.2d 587, 592 (Tex. App. – Dallas 1987, writ ref'd n .r.e.) (when a contract is limited by the happening of an event or contingency, the event or contingency determines the duration); *Metromarketing Services, Inc. v. HTT Headwear, Ltd.*, 15 S.W.3d 190, 195-96 (Tex. App. – Houston [14th Dist.] 2000, no pet.) (stating that when the parties do not fix the time of performance, courts imply a reasonable time for performance); *Gulf Oil Corp. v. Reid*, 161 Tex. 51, 337 S.W.2d 267, 275 (1960) ("Where no time is fixed for performance of any phase of a contract, the law necessarily will imply that it is to be performed within a reasonable time. That which is implied in a written contract is as much a part of it as though it were expressed therein.").

Thus, the general rule appears to allow a court to imply a term for a contract that does not contain one. As one court has aptly stated, however, "[n]either the *Clear Lake City Water Authority* opinion nor any other Texas case appears to explain how courts should determine whether to imply that an agreement is terminable at will or to imply that it lasts for a reasonable time." *WesternGeco, L.L.C. v. Input/Output, Inc.*, 246 S.W.3d 776, 781 (Tex. App. – Houston [14th Dist.] 2008, no pet.). From the Court's review of the existing case law, there is at least one principle that emerges that can be applied here. Specifically, when a contract is limited by a recognized contingency or an event of limited duration, then it is reasonable for a court to look to that contingency or event to imply a term for the contract. This appears to be a case where that principle is applicable.

Here, Edgewater argues that the parties clearly anticipated that this contract would last as long as the policies around which it revolved lasted, and thus the Court should imply such a term into the contract, as this is an ascertainable contingency that would allow the court to make such an implication.  The face of the contract supports this argument.  Cutting through the details, the CPSA's structure was quite basic: IDI would pay Edgewater 50% of its income on a finite set of PPLI policies, and Edgewater would service a separate (but sometimes overlapping) finite set of policies, and consult with IDI about the PPLI industry.  It is undisputed that the commission income on PPLI policies continues throughout the life of the policy.  From this, it is quite easy to infer that, at a minimum, Edgewater anticipated the contract lasting until the commission income ceased.  Moreover, given the history of the how the contract came to be, as detailed in the findings of fact, it appears clear that the parties viewed the payments as a referral fee, and their mutual expectation was that IDI's obligation to make payments would continue for the life of the policies.  There is absolutely no evidence to suggest otherwise.  Indeed, it would run counter to all of the evidence to assume or imply that the parties anticipated that IDI could unilaterally end the payment obligations whenever it pleased.  From the evidence, the most reasonable implication is that the CPSA was to extend until the last of the Appendix II policies terminate, either through the surrender of the policy, or the death of the insured.  So long as there are policies paying commissions to IDI, the only reasonable conclusion is that the parties expected the CPSA to remain in force (unless, of course, they mutually agreed to terminate it sooner).

Accordingly, the Court concludes that under Texas law, a term equal to the life of the policies listed in Appendix II of the CPSA should be implied into the CPSA.  Thus, the Court rejects IDI's claim that the contract is terminable at will or has been terminated.

C.    **Edgewater's Claim that IDI Breached the CPSA by Failing to Pay 50% of Trail Commissions**

As noted at the outset, IDI's contention that it did not breach the CPSA when it stopped making full payments in May 2008, and further reduced the payments thereafter was entirely dependent on IDI prevailing either on its claim that its payment obligation was excused due to Edgewater's breach, or its claim that it had the right to terminate the agreement.  Having failed on those arguments, IDI therefore breached the CPSA by its actions with regard to reducing payments to Edgewater commencing in 2008.  Chesner testified that the amount withheld by IDI from May 2008 to December of 2009 was $746,000.00.  Defendant's Exhibit 168.  He further testified that the damages increase an additional $20,000.00 per month after that date.  Tr. Vol.  III at p. 167.  Thus, through the end of August 2010, the damages total $906,000.  Prorating the month of September 2010, through the date of this opinion,[27] the total comes to $911,336.00.

D.    **Edgewater's Claim that it is Entitled to Half of IDI's Settlement with DeLuca**

As noted in the findings of fact, in December 2008, IDI and DeLuca entered into a settlement agreement in which IDI relinquished its right to future commissions on policies it had brokered for DeLuca family members, in exchange for the payment of a large sum.  Edgewater contends that this payment is subject to ¶ 3.1 of the CPSA, and thus 50% of it must be shared with Edgewater.  The relevant language of ¶ 3.1 requires that "IDI shall pay Edgewater fifty percent (50%) of all income paid to IDI directly or indirectly by any insurance carrier with respect to each policy listed on Appendix II."  Plaintiff's Exhibit 24 at ¶ 3.1.  Edgewater contends that the monies received by IDI from DeLuca is "income paid to IDI . . . indirectly by [an] insurance carrier," given that DeLuca only

---

[27]At $20,000 per month, the daily amount for September would be $666.67.  Rounding that to $667 per day, the total for September through the 8th of the month would be $5,336.

made the payment because he received cost concessions on the relevant policies from AIG as part of the overall settlement of the disputes that arose between all of the parties to DeLuca's OPPLI policies. Notably, IDI and DeLuca obviously contemplated the possibility of Edgewater seeking half of these funds, as they included within their settlement agreement an indemnity provision stating that if Edgewater successfully argued that it was entitled to 50% of this money, DeLuca would indemnify IDI in that amount. For its part, IDI asserts that it is not required to pay the money because it was not paid directly or indirectly from an insurance company, but rather was paid by DeLuca.

The Court rejects Edgewater's arguments for two reasons. First, the evidence connecting the payment by DeLuca to IDI with any sums or discounts DeLuca received from AIG is too weak to allow the DeLuca payment to be characterized as one made "indirectly by [an] insurance carrier." The evidence presented at trial shows that in the AIG Settlement Agreement, only 6 of the 16 DeLuca policies which were given the cost concessions had been brokered by IDI. Defendant's Exhibit 164. Chesner confirmed that IDI brokered only about a third of the DeLuca AIG business. Tr. Vol. III at p. 176. Further, there were a series of disputes between IDI and DeLuca, and the settlement agreement resolved all of these disputes. There is no way to know, at least from the evidence before the Court, how the size of DeLuca's payment was calculated within the context of all of the disputed issues, and how much should properly be considered a payment in lieu of commissions. Further, as IDI points out, the payment was made by DeLuca, and was not made by an insurance company, or made contingent on the receipt of any sums from any insurance company.

Second, in Edgewater's own settlement with DeLuca it waived its right to receive "any compensation related to the DeLuca Family Policies that accrues after December 31, 2008, including the right to receive any portion of any payments from AIG Life of Bermuda and its affiliates or any

29

other insurance broker, insurance carrier, or any other individual or entity that pertain to the DeLuca Family Policies."  Tr. Vol.  II at p. 42; Plaintiff's Exhibit 13.  The agreement between DeLuca and IDI explicitly made DeLuca's payment due on January 1, 2009.  Thus, in entering into these agreements, DeLuca rather clearly intended that Edgewater not receive any of the funds he was paying IDI, and structured the agreements to accomplish this.  Edgewater cooperated in this structure when it voluntarily waived any right to funds that accrued after December 31, 2008.  Since the payment to IDI was made on January 1, 2009, Edgewater's waiver prevents it from making a claim to any of those funds.[28]

For these reasons, the Court finds that Edgewater is not entitled to any of the settlement funds that IDI received in its settlement with DeLuca, and rejects Edgewater's breach of contract claim to this effect.[29]

---

[28]The Court rejects Edgewater's construction of the agreement which contends that IDI's right to the payment "accrued" when the Agreement was signed.

[29]Edgewater also makes a claim for "money had and received" and requests the Court to impose a constructive trust on the monies IDI is allegedly holding in escrow. A "money had and received" cause of action is an equitable cause of action and belongs conceptually to the concept of unjust enrichment. *Amoco Prod. Co. V. Smith*, 946 S.W.2d 162, 164 (Tex. App. – El paso, no writ). It is applicable in situations that are not governed by a contract. *Id.* This is a breach of contract case and thus a money had and received claim is inapplicable here. A constructive trust is a remedy imposed upon property obtained by fraudulent means. *Thigpen v. Locke*, 363 S.W.2d 247 (Tex. 1962). A constructive trust is justified when one party commits fraud or breaches a confidential relationship. *In re marriage of Nolder*, 48 S.W.3d 432 (Tex. App. – Texarkana 2001). Edgewater's remedy is plainly one that sounds in contract, and a constructive trust claim is inapplicable here. Finally, Edgewater requests punitive damages in connection with its money had and received claim. Because the Court finds that the money had and received claim fails, the concomitant claim for punitive damages also fails as a matter of law.

III.    **Conclusion**

In summary, the Court rejects IDI's breach of contract and declaratory judgment arguments, and finds that IDI was obligated by the CPSA to make the payments to Edgewater that it ceased making beginning in May 2008. Accordingly, the Court finds in Edgewater's favor on its breach of contract claim. The damages for that breach through the date of this Memorandum Opinion and Order are $911,336.00. The parties have stipulated that the reasonable and necessary attorney's fees incurred by Edgewater in pursuing the claims tried to the Court are $125,000.00.

The Court also rejects Edgewater's claim that IDI breached the contract by not paying one-half of the funds it received in settlement of its claims with DeLuca. The Court further rejects Edgewater's claims for money had and received and constructive trust.

Finally, the Court rejects IDI's argument that the CPSA is terminable at will, and instead concludes that it will terminate when the last of the policies included on Appendix II to the agreement terminate.

With one exception, the Court is prepared to enter judgment consistent with this opinion, which will include attorney's fees and costs (which are agreed upon), and post-judgment interest (which is set by federal law). Edgewater pled for prejudgment interest, but has not addressed that issue in its briefing. Thus, the Court ORDERS that no later than September 15, 2010, Edgewater submit a brief of no more than five pages addressing whether it is seeking prejudgment interest, and if so, the proper rate, along with a precise calculation of the interest accrued through the date of the submission, including the dollar amount that will accrue daily thereafter. Counsel for Edgewater is further ORDERED to confer with counsel for IDI on the calculation, and to state whether the parties have been able to agree on the calculation. They are strongly encouraged to do so. If, however, there

31

is no agreement, IDI shall state its position in a brief of no more than five pages filed no later than September 21, 2010, and shall likewise include precise calculations of the interest it claims is due, as set out above.  No additional briefing will be permitted on this issue.  Upon receipt of this additional material, the Court will enter a final judgment in this matter.

SIGNED this 8th day of September, 2010.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE